versus Shelman Kingdom Way Group Company, case number 18-1892. I believe we're ready when you are, Mr. Nowak, and you reserved five minutes of your time for rebuttal. Yes, Your Honor, I did. Okay. All right. May it please the court. I will begin with the deliberate motion in this case, which was the reason for the district court summary judgment decision. The district court relied on four different types of evidence to reject Dr. Sherman's test results. I will talk about each of those reasons. First, the district court relied on cell viability tests done by Sendrew's employees, which allegedly showed that the cells would be alive up to 10 minutes following the application of the hexane. Those tests were done in accordance with Conica's protocol. Dr. Sherman provided supplemental cell viability tests following the same protocol, which showed that the microorganisms remained alive, or I should strike that, were killed within 15 seconds after the application of solvent. Both... That solvent was hexane, right? I'm sorry? The solvent was hexane, right? The solvent was hexane in both cases, correct. The cell viability tests were done in the same way, under the same protocol. One showed that the cells were killed in 15 seconds, and one showed that the cells might not have been killed in 10 minutes. The court relied on the cell viability tests done by Sendrew, which showed they could still be alive in 10 minutes, and rejected Dr. Sherman's test. Since the tests were done in the same way, the protocol was the same for both. This is clearly a question of fact for the jury to decide which set of tests was correct. Okay. Let me back up for a minute. Isn't it true that the problem here is that your expert altered the protocol that had been agreed to by both of the parties and the court, perhaps, for the protocol that was going to be used because he thought that one of the steps, using ice, was unnecessary. Do I have that right? Yes, you do, Your Honor. Here's the situation. The plants that were inspected are in Inner Mongolia. We had to have a mobile lab drive out to Inner Mongolia, ship all the material that we needed to do the test, and, of course, we were never sure whether all the material was going to arrive, even if the mobile lab was going to get there on time. So the protocol was meant to cover any problem that we had with the supplies, for example, when we got to the plants at Inner Mongolia. When we got to Inner Mongolia, the defendants were cooperative. We were parked close to the places where we took the samples. So Dr. Sherman, in his experience of 35 years, and I can explain that to you, knew very well that immediately adding the solvent to the sample that we took would kill the microorganisms. Once the microorganisms were dead, there was no reason to use ice or shaking because once the microorganisms are dead, nothing can change. The reduced value can no longer change. So the two points you make about using ice and shaking is not necessary if the solvent kills the hexane upon contact, and that was Dr. Sherman's belief. It was your expert, Dr. Sherman, who actually created the protocol. That is correct. And he went on to violate that very protocol. Well, as I said, Your Honor, the purpose of the protocol was to have everything down on paper. For example, the solvent that we needed to add to the microorganisms very likely could not have arrived, and in that case we would have used ice. Keep in mind, please, in the ITC, the Connecticut was criticized for using ice and not freezing the microorganisms. So even if we wanted to use ice, their own experts said that the ice would not have an effect for 35 minutes or 25 or 30 minutes. We were five minutes from the mobile lab where we did the test. You agree that it would have been ideal had your expert just used the ice even if he thought it was irrelevant, right? I'm sorry, say that again. I said you agree, though, it would have been a lot easier had your expert just used the ice and followed the protocol even if he thought it was unnecessary. Then you wouldn't be here, right? I mean, I understand your point. Your point is that, as I understand it, you're saying there's enough indicia here to show that his method was scientifically viable enough that at least it should have gone to the jury. Yes, Your Honor, and I would like to explain to you why he knew very well that the microorganism, that solvent would kill the microorganism. Let me go right to that section. This is another reason why the district court rejected Dr. Sherman's test results, and that was based on that Sherman's findings were not based on sound science. That is your ice and shaking issue, right? In response to that rejection, Dr. Sherman provided a declaration stating he had 35 years' experience as a microbiologist, and during those 35 years, he had thousands of times used solvent to kill microorganisms. The solvent included hexane, and the microorganisms included rhodobacter spuriotis. Based on this pre-litigation research, Dr. Sherman stated in his declaration that there's no question applying a solvent mixture 215 times greater than what was set forth in the defendant's peer review papers would clearly kill the microorganisms. Let me back up one moment and say, a peer review paper provided by the defendant said, microorganisms may still be alive when you apply solvent at a ratio of 0.1%. That was for a certain kind of microorganisms, is that right? I'm sorry? Wasn't that for a certain kind of microorganisms? It was a number of different microorganisms, right? But the district court judge relied on their peer review papers to reject Dr. Sherman's test results. In the peer review papers provided by the defendants, if you applied solvent at a 1% level, the cells were killed. So the argument that Dr. Sherman is making, we provide solvent at a level 215 times greater than what was in the defendant's peer review papers, and those peer review papers said that the microorganisms would die at 1%. Can I ask you, just to make sure I understand the articles you're referring to, these are the articles that refer to extremophiles? Yes. And so there's also dispute as to whether hexane is in fact an extremophile. Is that correct? We provided papers, peer review papers, that says hexane is an extremely volatile solvent. It dissolves the cell membrane and kills the cells. That's on the papers we provided. Right. I understand. I'm just trying to make sure I understood. I was trying to figure out which articles you were referring to. Yes. Okay. Right. So the point we're making is, I mean, the district court said, relied on the defendant's papers showing that the microorganisms could be killed at a, could still be alive at a 0.1% level. Dr. Sherman, based on his pre-litigation experience, and the fact that we were using 215 times that level of 1%, that the microorganisms would have been killed immediately. That is why we did not use ice or shaking during the test, because there was no need to do that. Dr. Sherman has shown by his 35 years of experience as a microbiologist that when you add the solvent to it. Is there any other evidence that you produced that would corroborate what you just told? I'm sorry? Is there any other evidence that you produced that would corroborate that there was no need to use the ice or? The best evidence is the defendant's own papers, where they showed microorganisms were killed at a 1% level, and when we added solvent, it was 215 times that. What about the testimony of Dr. Taylor and Dr. Leventz from the other litigations, where they testified that you could either use solvent or use ice in order to stop the metabolic activity? Yes, yes, of course. You can use a solvent. If you look at the ITC decision, I don't know if you read that, there were three ways to do this. Use solvent, you could use ice. Ice slows down the rate of, how can I say this? Solvent kills the microorganisms immediately. Freezing will kill the microorganisms, so the reduced level won't change. If you add ice, it will slow down the process, but there will still be an increase in the reduced level, and that is not proper because you take the measurement and you don't want the reduced level to change as the sample is stored and then tested later. That's why using ice was criticized in the ITC, directly criticized. That's one major reason why Conaca had to build a mobile lab to get it close to the point where we took the samples, because getting the sample and shipping it off to a lab in a way that's unprotected would change the reduced level. I'd like to ask you about claim construction. I'm sorry? I'd like to ask you about claim construction. One of the things that you argue is you say that the district court reinterpreted our interpretation of the claim of the term sealed tank, but isn't it fair maybe to say that what the district court actually did was look at the term sealed tank and how we interpreted it in the context of the entire claim phrase, which talks about extraction in a sealed tank. So isn't it most fair to read the district court's construction as being simply an understanding of the entire phrase in light of the Federal Circuit's interpretation of sealed tank? Your Honor, the district court added a one-way check valve to the claim. It said that you have to have the extraction, the entirety of the extraction has to be in a sealed tank, right, as defined by the Federal Circuit, the meaning of sealed tank as defined by the Federal Circuit. And then there was the discussion of the one-way valve and the two-way valve. Do you understand what my question is? Because I think that the whole claim phrase says, in extraction in a sealed tank. And so from that, you could say that the district court understood that the entire phrase required that there be, during the entirety of the extraction, there would be no exposure of the contents of the tank to the atmosphere. Well, Judge Otero in California was required to follow the claim construction that was reached by this court in the Kingdom Way decision. That's my understanding. That's the law of the case. But isn't it true, though, that even if the appellate court has a particular claim construction of one term, that doesn't prohibit the district court from interpreting a whole limitation that includes that one term, right? Well, Your Honor, he significantly changed the claim construction by adding a one-way check valve that would continually release hexane into the atmosphere, which is bad for everybody in the plant. And then during the filling process, but prevent air from entering the tank. And what he said about that is, again, his conclusion was that his construction was fully consistent with the patent specification, which discloses that at least with respect to reduced Q10, the primary concern during extraction is preventing oxidation. When we're making oxidized Q10, we don't care about oxidation of the reduced Q10. Our goal is to get everything oxidized by the end of the process. So that's the confusion with the definition of sealed tank. The extraction tank is towards the end of the process, right? The reduced Q10 is made before that. Once it reaches a certain level, we want it to be oxidized. Can I ask you a separate question? When do you think extraction starts? That's a very good question, Your Honor. All right. Extraction can either start, and it depends upon the definition. Extraction can start when the solvent touches the microorganisms, or it can start when the stirring starts, because then you're circulating the extraction or the solvent throughout the material in the tank. There's been testimony two ways on that. Okay. All right. Our position is extraction starts when the solvent enters the tank. All right. Okay, Mr. Nowak, you almost used up all your rebuttal time. If you stop now, I can give you some rebuttal time later. Okay. Let me reserve it for rebuttal. Okay. Okay. Thank you. Mr. Naitich? Is it Naitich? Naitich? Naitich. Naitich. Good morning, Your Honors. May it please the Court. I'd like to start with the sealed tank issues first and then move on to the Daubert ruling. And I would like to start the sealed tank argument by – These are independent grounds for affirmance in your view, correct? Yes. All right. The Daubert ruling didn't cover the old process. Kingway has a new process. Okay, so they really aren't independent grounds. Yes. They cover – Daubert doesn't get you all the way home. You need sealed tank. Yes, Your Honor. All right. I'd like to begin by addressing the question you just asked, Judge Stoll, which is when does extraction begin? And there are experts submitted – I think both parties are actually in agreement because there are experts submitted a declaration, and it's on Appendix Page 4597, Paragraph 13. He says, A person of ordinary skill in the art would understand that extraction would start when the microorganisms containing coenzyme Q10 are exposed to organic solvent, including N-hexane. And the reason that's important is that – The valve is open at that time. It's open. And the extraction doesn't occur in an instant. It takes a certain duration of time. It starts when the valve is open, and extraction ends when the CoQ10 actually comes out of the cells. One of the things I'm struggling with is just the plain language, extracting the oxidized coenzyme Q10 by an organic solvent in a sealed tank. How do we go from that language to it's in a sealed tank during the entire extraction process, which I understand to be multiple hours long? I understand that your valve is open for a certain period of time at the beginning of that process, but then it's closed. Well, why should we interpret this claim and understand it to require that it has to be sealed or in a sealed tank during the entirety of the extraction process when the claim says nothing about integrity? Well, I would say this, that when you realize that extraction doesn't just happen in an instant, it takes place over a period of time. And, you know, the extraction, when it begins, it's exposed to the atmosphere because the relief valve is open, happens over a period of time. So there's not going to be even one cell microorganism that's extracted completely. All of the cells are at the beginning exposed to the atmosphere. And then if you look at the, we differ on this, but I think the whole reason for a sealed tank is to prevent oxygen. You want to prevent oxygen from coming into the tank. So if you're letting oxygen into the tank, you're sort of defeating the purpose of having a sealed tank. It's a little bit like if I have a pot on the stove and I take the top on and off, it's not sealed. You know, you're not cooking while sealed if you take it on and off. No, but if you take it off just for a moment and put it back on, you probably end up with the same efficient cooking that you would have had if you just didn't take it off for just a second. Well, I guess I would argue that that's, it's really a doctrine of equivalence argument. They're making that it's sealed most of the time or it's sealed some of the time. Well, it would be doctrine of equivalence if the, if the claim said throughout the time and the infringing, the accused infringing device did it almost all the time, but just popped the valve open. But here the whole question is what does the claim mean? Right. So it's not really doctrine of equivalence. Well, I guess my argument would be that, I mean, I think that if you're extracting and we all agree that it starts when things open. So that's, we're, they're experts in agreement with that. That you have to, you're defeating the purpose of the claim if you're leaving the pot open or the tank open some of the time. Why are we talking about their accused product to interpret the claim? I mean, shouldn't we be talking about the intrinsic evidence? What is the intrinsic evidence to support the idea that it has to be in a sealed tank during the entire extraction process? Well, I, okay. So the, the intrinsic evidence would be that, that the patent talks about protecting from an oxidation reaction. And I think that's really the only support for adding the sealed tank limitation. And this, actually the plain language of this court's construction is, in the law of the cases, this court's construction, which is you're protecting the contents of the tank from the atmosphere. So, and that's based on, you know, the description in the patent of example eight, where it's talking about, it's talking about sealing under a nitrogen gas. So you're using nitrogen gas, and you are deoxygenating the atmosphere. Why are you doing that? You're trying to prevent oxygen from getting into the tank. Well, it talks about continuous extraction as well. And do I understand correctly that during that continuous extraction in the process of figure eight, you're going from one tank to another? Is it moving during that continuous extraction process? I think it is moving from one tank to the other. So we have to understand that the valves and all of those situations, everything's always during the entire extraction process in figure eight, it's constantly sealed from the atmosphere? Yes. And I think the patent is clear about that. That you don't, you want to, you don't want, it puts a nitrogen gas in there. Can you identify for me where that is? Well, I'm, I should say, the patent's clear about protecting from an oxidation reaction, but I will point you to, okay, so on column 16, starting at line 16. What page are you on? Oh, I'm on, sorry, I'm on appendix page 395. Okay. So starting at line 16, I mean, column 16, line 16, and going to around line 39 is the discussion of when you recover the disruption, you're trying to protect from an oxidation reaction. And then when you get down to around line 35, it's talking about, for example, you could use a deoxygenant atmosphere, such as an inert gas, such as nitrogen. Now, I'm not saying you have to. Wait, where are you? Oh, okay, I'm on line 30. Okay, so I'll read 36. Okay. It says, for example, a deoxygenant atmosphere, an atmosphere of an inert gas, such as nitrogen gas, carbon dioxide gas, dot, dot, dot. Okay, that's what it's talking about. That says, for example, right? Right. And then the language up above says, preferably. Okay, well, so here it's saying that's an example of how to protect. There's other ways to protect, okay, but then I'll go to my next site, which is column 23. And this is actually, this is a description of example 8 that the court relied on in its previous opinion. This is precisely what it construed sealed tank based on. And so if you look at column 23, line 20, it starts the sentence saying, the obtained cells were disrupted for two times. So it's talking about cell disruption there. And then if you go down a few lines to line 22 or 23, it says, it's sealed with nitrogen gas to obtain a cell-disrupted solution. And what the Federal Circuit said, and that's the line, the key line that it relied on in its previous opinion to construe sealed tank. It says, see, it says, the concern with the patent is not sealing with respect to solvents. It's sealing with respect to the atmosphere. And if you look at this passage where you're sealing with nitrogen gas, and you'll recall from the previous paragraph I cited, it's talking about you use the nitrogen gas to seal from the atmosphere. And this is the very passage the court relied on when construing sealed tank. So my point is, the whole purpose of the sealed tank, why they added this during prosecution to overcome the prior art,  I'm sorry, I don't know where the time. You've got five minutes. Okay. So as I understand it then, the idea is this, is that you can't be protected from the atmosphere or have extraction in a sealed tank unless that entire extraction process is in a sealed tank. Yes. And one other point I want to make is, they stipulated to non-infringement on two separate grounds. So what they call in their brief, they call it the timing limitation and the venting limitation. But really what we were discussing is what they call the timing limitation. The other grounds that they stipulated on are that the district court said oxygen is not allowed to enter the tank. It's okay to leave the tank, but it's not, air from the atmosphere is not allowed to enter the tank. That's the one-way versus two-way valve discussion, right? Yes. Okay. And they stipulated on separate grounds, and that may even be the clearer basis. I mean, it was discussed quite a bit in the previous one. Show me where, because I was looking through the stipulated judgment and trying to understand. Can you show me where you think your best support is for what you've just said? Appendix page 4636. And then I'm looking at paragraph, it's paragraph 13, sub-numeral 2. Okay. And starting, it's really A through D. So A specifically relates to the idea that you're protecting the contents of the tank from the atmosphere and not the atmosphere to the tank. Then B talks about oxygen is not allowed to enter the tank. They're quoting from the district court's ruling. Aren't they here just repeating what the court's construction was? Yes. So then you have to look at paragraph 14 where they say, paragraph 14 and 15, they say, we don't agree with the court's construction and for that reason we don't infringe. I'm paraphrasing, but you have to take the paragraphs in combination. So are you reading the stipulation then as being, putting the plaintiffs in a position that if they're right, that the instruction, the construction was wrong, but it was only wrong with respect to one of the two points that they disputed, that they lose? Yes. Either way they lose. Even though what they have stipulated too is that we contest the construction on each separable element of the construction. Well, the timing limitation really applies to the relief valve, which is open, but this venting limitation doesn't really make any difference with respect to the relief valve because it can come in and out. That relates to the condenser. But there are two elements then that are in dispute dealing with the claim construction. And it looks to me like they are simply saying we stipulate that if the district court is right with respect to the claim construction, we would lose. Right. But that seems to me to be unitary, not binary. Well, I tried to include for context what the actual system does. And I think it's clear that if, for example, if they lose on the oxygen, their argument with respect to the condenser is that the solvent condenses. It prevents the solvent from getting out into the atmosphere. But air can come in and air can come out. But their position is it fringes, the accused plant infringes simply because it prevents solvent from leaving the plant. My recollection of the record, and I can't find it in the record now, I'm sure you know where it is, but that not only was there evidence that, and I think this was from both sides, but there was evidence that the extraction starts when the solvent hits the Q10 right away, the enzyme. Is there also evidence that the extraction, the bulk of the extraction occurs in the very first few minutes? Yes. Something to that effect. Yes, there's extra testimony on that. I can find it quickly in my red brief. Okay. Yeah. This may not go directly to the question of claim construction, but I'd be curious to see what it is. Okay, so I have a statement in my red brief, and it says the solvent extracts the CoQ10 quickly within minutes of contacting the powder. What's the site for that? It's 4914. Okay. And I believe there's another site as well that I can find. Oh, yeah. That's the... It starts at line 24 on that page. Right. And what is this on page 4914? Is this somebody's testimony? Whose testimony is this? Yes, this is testimony from the ITC. And it is... I think this is a corporate representative for... I'm not sure. Okay. Let me see if I can find the other site. This was introduced into the record in this case? Yes, this is part of the record. Right. And then there's another site at 5451, paragraph 234. This is from an expert report. The expert just says it's his understanding that most is extracted during when the tank is not sealed. What was the site that you just gave? It's 5451. Thank you. Paragraph 234? Yes. This is our expert report. Okay. So I just wanted to return to the point that in our system, the air can come in and out of the condensers. And they have stipulated, based on the portions I have, that if air comes into the tank, I believe there's no infringement and the whole appeal should be able to be infringed on that grounds alone. I'll switch to the Daubert ruling. You're out of time, but you can very briefly address the Daubert. I'll just say that there were a number of deficiencies that were already discussed by the court in these questions. To sort of fill those deficiencies, Kanika tried to submit objective evidence very late after the experts had already mentioned it. What about the other evidence that they submitted, other than those articles? I guess not the articles, but the testing that they had done. What about the other evidence, including that, I can't remember the exact number, but the expert had been working in this field for 35 years and said that he had used a solvent in this way on other microorganisms. I think he said thousands of times or hundreds of times. I don't recall. Doesn't Daubert say that one of the things you should look at in whether the expert themselves had used the technique and issue outside of the context of litigation? Yes. What the district court found, and I believe he was correct, is that in these circumstances, you can't just rely on the expert's say-so, his ips and dixit. First of all, the defendants did testing, which shows that the solvent doesn't kill it immediately. He said in his own protocol that he was going to use an ice bucket. Our expert handed him an ice bucket in protest, and it's, no, we don't want to use an ice bucket. So when you take all of the circumstances, and our testing showed that it makes a big difference whether or not you use ice. I understand what you're saying. What about Dr. Taylor and Dr. Leventz's expert testimony? You were both, I understand, in positions opposed to Kanika, who also said, you know, if you want to stop the metabolism, you could either use a solvent or use ice. Well, they're right. I mean, you can use ice to stop it. That's our position is that you use, they should have used ice. The question is whether you could use solvent. I mean, the point is, is that if there's, you know, I, I understand your position. I'm just wondering whether given his experience, where he says he's done it thousands of times, it's not just Ipsy Dixit. It's not just him saying, well, I say so. It's saying I've done this before. And then also you've got expert testimony. And then you've got, in addition to that, what the district court's findings on rejecting the indefiniteness defense. You can use solvent, but there's a lot more to it. There's a question of, did you mix it? Did you shake it? How quickly does it kill it? I mean, you can tell from our sealed tank arguments, there's solvent there, but it's not killing them immediately. It takes a while, which is, even, they don't want it to kill it immediately for purposes of that term. So it's not just a simple matter of, the real question is, does the solvent kill it immediately such that you don't need ice for the five minutes it takes to transport the samples? Okay, thank you. Mr. Newark, I'm going to restore you to three minutes of time. Three, if you need it. Okay, so first, I want to clarify the argument that the patent shows that a sealed tank is to prevent oxygen from coming into the tank, okay? So first, let's go to the patent itself. I think that begins at 384. And go to column 16. Column 16. 395 is column 16. There, they cited column 16, but if you look at the beginning, at line 13, 14, that's for recovering reduced Q10, not oxidized Q10. I know this is difficult to understand. The patent, when it was written, covered both reduced and oxidized. They are two different products, right? Reduced Q10 has to be protected from oxidation because you want to recover reduced Q10 at the end of the process. Oxidized Q10, you don't care about oxidation because you want it to be fully oxidized. The product, you can buy Q10, the oxidized version, and you can buy reduced Q10, which I take every day because it's better. So the patent itself described both processes, right? And since we're talking about making oxidized Q10, which the defendants make, the reduced Q10 does not have to be protected from an oxidation reaction. All right, he also mentioned example 8, right? You mean the oxidized. I'm sorry? Q10 doesn't have to be protected. You said the reduced doesn't have to be protected. You mean the oxidized doesn't have to be protected. Oxidized, I'm sorry, doesn't have to be protected, yes. Let's go to example 8 at column 23 where my opponent said that because they're talking about sealing and adding nitrogen and so forth, and that the Federal Circuit relied on that. Example 8 is talking about a pressure homogenizer, which uses nitrogen gas to obtain a cell-disrupted solution. The pressure homogenizer, which is on 1, 2, 3, 4, the fifth line from the top, that's which disrupts the cells. It has nothing to do with extraction or sealed tank. And indeed, Kingdom Way, in their appellate brief in the Kingdom Way case, on page 24 of their opposition brief said, and I quote, the only use of the word sealed in the written description is in the context of a pressure homogenizer sealed with natural gas to obtain a cell-disrupted solution in example 8. This is what they argued to the court. However, the pressure homogenizer is a piece of equipment used for the physical disruption of microbial cells, not extraction, and therefore this isolated use is unrelated to the way sealed is used in the claims. Example 8 has nothing to do with sealed tank. Now, the Federal Circuit, yes, in the Kingdom Way decision, they mentioned example 8, but if you look at that decision, it's on page 1304 near the bottom, the court said, though example 8 refers to extracting reduced Q10, the specifications help to just, though example 8 refers to extracting reduced Q10, the specification describes how to similarly extract oxidized Q10.  They noticed the difference. Okay. Thank you, Mr. Nauert. Thank you for your argument.